Miller, Rosalind H., J.
After her husband James J. Dwyer (“decedent”) died, the plaintiff Agnes P. Dwyer (“plaintiff’) commenced this action against defendant Boston Scientific Corp. (“defendant”), alleging that the medical device that the defendant had manufactured and that had been implanted in the decedent had a manufacturing defect that caused the decedent’s death. This case is before the court on the defendant’s motion to dismiss. For the following reasons, the defendant’s motion is DENIED.
BACKGROUND
For purposes of a motion to dismiss under Rule 12 (b) (6), the court must accept as true all of the factual allegations in the plaintiffs complaint.
The defendant designed, manufactured, and distributed cardiac re synchronization therapy dif-ibrillators, including the COGNIS model N119 (“CRT-D” or “device”), a Class III medical device. The defendant obtained pre-market approval (“PMA”) for the device from the Food and Drug Administration (“FDA”). The defendant is required to comply with all applicable FDA standards, rules, and regulations that are established and approved through the PMA process.
At some time prior to July 31,2011, the CRT-D was implanted in the decedent. On July 31, 2011, the CRT-D failed while the decedent and the plaintiff were in church. The decedent lost consciousness and fell. The fall resulted in major head trauma, and the decedent died from intracerebral hemorrhages on August 19, 2011. Prior to the decedent’s death, on August 10, 2011, the CRT-D was explanted from the decedent and returned to the defendant for testing.
In a letter dated August 26, 2011 and addressed to the decedent’s cardiologist (“2011 letter”), the defendant[2] wrote:
*618 Our analysis has confirmed that an internal component [of the CRT-D] failed (a transformer), resulting in electrical overstress damage to the device circuitry. The electrical overstress damage resulted in the inability to interrogate the device and lack of pacing output, which was observed clinically and confirmed during returned product testing.
. . . Initial electrical/functional testing revealed that one of the transformer’s secondary wires was fused open and damage had been sustained to the power supply circuitiy due to electrical overstress . . . [T]he transformer was carefully removed ... to facilitate evaluation of the individual layers of windings. The transformer was then disassembled to allow visual inspection of the primary and secondary windings. Open wires were detected on one of the secondary windings .. . Wire breaks were noted near the top of the ferrite core.
The wire damage on the secondary windings was a result of arcing between adjacent wires causing the open condition in the transformer. This component failure also caused collateral damage to the associated power supply circuitiy, thus preventing the device from providing life-sustaining therapy. The damage also resulted in the loss of all memory content. Because this type of failure occurs during high energy charging, our failure analysis engineers were able to conclude that this transformer malfunction most likely occurred during an automatic capacitor reformation.
... To reduce the effect of capacitor deformation on charge time, [CRT-Ds] perform automatic capacitor reformations every 90 days . . . [T]he next automatic (scheduled) capacitor reformation for this device should have occurred on 31-JUL-2011 at approximately 11:42 A.M. . . .
A transformer is an integral part of the device’s high energy charging circuitry for delivery of shock therapy. It transfers energy stored in the battery ... to the defibrillation capacitors . . . The transformer is also an important component used to support a power supply for other device circuitry during charging.
Investigation of the root cause of arcing within the transformer has been determined to be a result of wire (and/or wire insulation) damage within the transformer windings. Damage to the windings can be exacerbated by high energy charging (application of high voltage), either during capacitor reformations or shock therapy delivery.
Exhibit A[3] to Complaint. The defendant also explained that, before the transformer is placed on the device, “the supplier for the transformer . . . conducts 100% electrical testing” in order “to detect wire (and/or wire insulation) damage within transformer windings . . . [0]nce this component is placed on the device ... it is again tested on 100% of devices. Pulse generator tests of a finished device also include numerous charge and defibrillation cycles and occur on 100% of finished devices.” Id.
At the time the defendant had conducted this testing, “the failure rate for this component remain[ed] in the rare category!,]” and the defendant had “received reports of approximately one transformer malfunction per 20,000 devices ...” Id. By the time of its April 2012 Product Performance Report, the defendant admitted that there had been a total of twenty-six transformer malfunctions, creating an identifiable pattern of malfunctions.
DISCUSSION
The defendant seeks the dismissal of all of the plaintiffs counts against it, arguing that federal law preempts them and that, alternatively, they fail to state a claim upon which relief can be granted.
I. The Plaintiffs Claims
The plaintiff has alleged four counts against the defendant — wrongful death (Count I), for which the plaintiff seeks punitive damages[4] (Count II) and damages for conscious pain and suffering[5] (Count III); and negligent infliction of emotional distress (Count IV)— contending that the defendant’s negligence, gross negligence, and breach of warranty[6] caused the decedent’s conscious pain and suffering, caused the decedent’s death, and caused the plaintiff to suffer severe emotional distress. In essence, the plaintiffs claims against the defendant sound in products liability, with the plaintiff alleging that the manufacturing defect in the CRT-D transformer windings resulted in material deviations from the FDA-approved device and caused the decedent’s death. The manufacturing defect resulted from the defendant’s violation of specific federal regulations that the plaintiff sets forth in her complaint:
The defendant did not manufacture the device in a way that ensured that the “quality policy [was] understood, implemented, and maintained at all levels of the organization.” 21 C.F.R. §820.20(a).
The defendant did not provide “adequate resources, including the assignment of trained personnel, for management, performance of work, and assessment activities,” 21 C.F.R. §820.20(b)(2), and did not have “sufficient personnel with the necessary education, background, training, and experience to assure that all activities . . . are correctly performed!,]” such as training that makes personnel “aware of device defects which may occur from the improper performance of their specific jobs.” 21 C.F.R. §820.25(a), (b)(1); see 21 C.F.R. §820.25(b)(2).
The defendant did not “ensure that the [CRT-D’s] specified design requirements [were] met” by “maintain[ing] procedures to control the design of the device . . .” 21 C.F.R. §820.30(a).
The defendant did not “establish and maintain procedures to ensure that all purchased . . . prod *619 uct[,]” i.e., wires and/or wire insulation within the transformer windings, “conform[ed] to specified requirements.” 21 C.F.R. §820.50.
The defendant did not “inspect) ], test) ], or otherwise verifty] as conforming to requirements” the incoming products, i.e., the wires and/or wire insulation-within the transformer windings. 21 C.F.R. §820.80(b).
The defendant did not “identify by suitable means the acceptance status of product, to indicate the conformance or nonconformance of product with acceptance criteria),]” 21 C.F.R. §820.86, or “maintain procedures to control product that does not conform to specified requirements.” 21 C.F.R. §820.90(a). As a result, the defendant did not manufacture the CRT-D in such a way that identified the device as defective or adulterated because the wires and/or wire insulation within the transformer windings were damaged.
The defendant did not “maintain procedures for implementing corrective and preventive action . . . to detect recurring quality problems . . 21 C.F.R. §820.100(a)(1).
The defendant did not “establish and maintain procedures for control and distribution of finished devices to ensure that only those devices approved for release are distributed . . .”21 C.F.R. §820.160(a).
The plaintiff alleges that the defendant was negligent because it manufactured and distributed the CRT-D when the wires and/or wire insulation inside the transformer windings failed to meet product specifications in violation of the regulations set forth above; she asserts that these violations also constitute gross negligence entitling her to punitive damages. As for the warranty aspect of her wrongful death claim, the plaintiff alleges that the defendant expressly and impliedly warranted that the CRT-D was safe, merchantable, and fit for its intended purposes and uses, and that by violating the above-listed federal regulations, the deféndant breached that warranty on which the decedent had relied. This negligence and breach of warranty were the direct and proximate cause of the decedent’s conscious pain and suffering and, ultimately, his death. See Colter v. Barber-Greene Co., 403 Mass. 50, 60-62 (1988) (discussing negligence and breach of warranty in context of products liability); Restatement (Third) of Torts: Products Liability §15 (“Whether a product defect caused harm to persons or property is determined by the prevailing rules and principles governing causation in tort”).
The plaintiff also alleges negligent infliction of emotional distress against the defendant. The plaintiff witnessed the defendant’s loss of consciousness on July 31, 2011, and his long medical decline, all of which was the proximate result of the defendant’s negligence and breach of warranty. These observations of the decedent caused the plaintiff to suffer severe emotional distress which manifested in physical symptoms. See Rodriguez v. Cambridge Hous. Auth., 443 Mass. 697, 700-01 (2005) (discussing bystander claim for negligent infliction of emotional distress).
II. Federal Preemption
The express preemption section in the Medical Device Amendments of 1976 (“MDA”) portion of the Federal Food, Drug, and Cosmetic Act (“FDCA”) provides that no state
may establish or continue in effect with respect to a device intended for human use any requirement—
(1) which is different from, or in addition to, any requirement applicable under [the FDCA] to the device; and
(2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under [the FDCA].
21 U.S.C. §360k(a)(l), (2). The defendant argues that this provision preempts the plaintiffs complaint as her claims would impose state law requirements that differ from or add to the requirements that federal law imposes. The plaintiff counters that her complaint alleges parallel claims that preclude preemption.
In Riegel v. Medtronic, Inc., 552 U.S. 312 (2008), the United States Supreme Court considered this preemption provision in the context of common-law claims challenging the safety and effectiveness of a Class III medical device which had received PMA from the FDA. Id. at 315. In conducting this analysis, the court applied a two-prong analysis: “[1] whether the Federal Government has established requirements applicable to” the device at issue; and, if so, “[2] whether the [plaintiffs] common-law claims are based upon [state law] requirements with respect to the device that are ‘different from, or in addition to,’ the federal ones, and that relate to safely and effectiveness.” Id. at 321-22, quoting 21 U.S.C. §360k(a). In the absence of any Massachusetts case law, from either state[7] or federal courts, this court looks to other jurisdictions for guidance in determining whether the plaintiffs claims here are parallel such that federal law does not preempt them.
A. Federal Requirements
The first prong considers whether the federal requirements at issue are “applicable to” the device at issue. In Riegel, the Court held that the PMA process “imposes ‘requirements’ under the MDA[;] . . . [PMA] is specific to individual devices!;]” and PMA is a federal review that “is focused on safety . . .” Id. at 322-23. Where the allegations in the complaint concern the PMAprocess, then, the first prong is satisfied because, with PMA, the federal government has established requirements that are applicable to the device. See id.; see, e.g., Waltenburg v. St. Jude Med., Inc., 33 F.Sup.3d *620 818, 833 (W.D.Ky. 2014) (“Plaintiffs’ Amended Complaint . . . alleg(ed) that the [defendant’s product] possessed] a manufacturing defect because the actual manufacture of [that product] deviated from the specifications set forth in the federal regulations and required by the PMA . . .”).
The federal requirements on which the plaintiff bases her claims here, however, are the Current Good Manufacturing Practices (“CGMPs”), 21 C.F.R. §820 et seq., which “govern the methods used in, and the facilities and controls used for, the design, manufacture, packaging, labeling, storage, installation, and servicing of all finished devices intended for human use.” 21 C.F.R. §820.1(a)(1); see, e.g., Rosen v. St Jude Med., Inc., 41 F.Sup.3d 170, 181 (N.D.N.Y. 2014) (“alleging that [defendant violated the applicable PMAs and/or CGMPs”). The CGMPs “are intended to ensure that finished devices will be safe and effective and otherwise in compliance with the [FDCA].” 21 U.S.C. §820.1(a)(1). Courts appear to agree that CGMPs are generally applicable federal requirements, see, e.g., Bausch v. Stryker Corp., 630 F.3d 546, 554 (7th Cir. 2010); In re Medtronic, Inc. Sprint Fidelis Leads Prods. Liab. Litig., 592 F.Sup.2d 1147, 1157 (D.Minn. 2009), aff'd, 623 F.3d 1200 (8th Cir. 2010); but courts “are not in complete agreement as to what constitutes a sufficient pleading with regard to a CGMP . . .” Bass v. Stryker Corp., 669 F.3d 501, 511 (5th Cir. 2012), and cases cited. This court agrees with the Seventh Circuit’s reasoning that there is no “sound legal basis ... to distinguish between general requirements [such as the CGMPs] and ‘concrete, device-specific’ requirements [such as those related to the PMA process]” given that 21 U.S.C. §360k(a) uses the phrase “ ‘any requirement.’ And federal law is clear: for manufacture’s of Class III medical devices, the . . . [CGMPs] adopted by the FDA . . . are legally binding requirements ‘under [the FDCA].’ ” Bausch, 630 F.3d at 555, quoting 21 U.S.C. §360k(a).
Having answered the first prong in the affirmative, the court turns to the second prong. See Riegel, 552 U.S. at 321-22.
B. State Requirements
The second prong considers whether the common-law claims the plaintiff alleges are “different from, or in addition to,’ the federal ones, and ... relate to safety and effectiveness.” Id. at 322, quoting 21 U.S.C. §360k(a). The issue of “safety and effectiveness” is not disputed here. Instead, the defendant argues that the plaintiffs state-law claims place requirements on the defendant that differ from or add to the requirements that federal laws impose. Section 360k(a) “does not prevent a State from providing a damages remedy for claims premised on a violation of FDA regulations; the state duties in such a case ‘parallel,’ rather than add to federal requirements.” Id. at 330; Bausch, 630 F.3d at 552 (“The Supreme Court. . . has made clear that section 360k protects a medical device manufacturer from liability to the extent that it has complied with federal law, but it does not extend protection from liability where the claim is based on a violation of federal law” (emphasis added)). “Stated differently, to survive . . . preemption, a state law cause of action ‘must be premised on conduct that both (1) violates the FDCA and (2) would give rise to a recovery under state law even in the absence of the FDCA.’ ” Coleman v. Medtronic, Inc., 223 Cal.App.4th 413, 427 (2014) (citation omitted).
Based on the defendant’s investigation of the device that had been explanted from the decedent, and as detailed in the 2011 letter, the device’s transformer failed as a result of wire and/or wire insulation damage within the transformer windings, and this damage was likely exacerbated by the high energy charging that occurred with the automatic capacitor reformation which should have occurred on July 31, 2011, at 11:42 a.m. The plaintiff alleges that the wire and/or wire insulation damage within the transformer windings resulted from a manufacturing defect that, in turn, resulted from the defendant’s violation of specific CGMPs, detailed above. The plaintiff has accordingly alleged that the defendant’s conduct violates federal requirements. See Brown v. DePuy Spine, Inc., 2007 WL 1089337, *11 (Bristol Super.Ct. April 9, 2007) (Garsh, J.) [22 Mass. L. Rptr. 425] (“State law claims that are based on a manufacturer’s failure to comply with the requirements imposed by the FDA are not preempted by [21 U.S.C. §360k(a)] because they would not impose different or additional requirements but rather would enforce the exact requirements imposed by federal law”). Contrast Ilarraza v. Medtronic, Inc., 677 F.Sup.2d 582, 588 (E.D.N.Y. 2009) (holding that plaintiff failed to state parallel claim “[d] espite the sheer volume of the material upon which” he relied where plaintiff merely “recite[d] unsupported violations of general [CGMP] regulations, and fail[ed] to tie such allegations to the injuries alleged”).
The plaintiffs allegations would also give rise to a recoveiy under state law even in the absence of the CGMPs, see Coleman, 223 Cal.App.4th at 427, because Massachusetts imposes a duty of reasonable care on manufacturers, see H.P. Hood & Sons, Inc. v. Ford Motor Co., 370 Mass. 69, 73 (1976), and because Massachusetts recognizes a breach of warranty where a product is defective and unreasonably dangerous as a result of a manufacturing defect.[8] See Evans v. Lorillard Tobacco Co., 465 Mass. 411, 422 (2013) (looking to Restatement (Third) of Products Liability §2 for explanation of types of defects); see, e.g., Stengel v. Medtronic, Inc., 704 F.3d 1224, 1233 (9th Cir. 2013) (concluding that plaintiffs’ claim was not preempted where they brought their claim “under settled [state] law that protects the safety and health of [state’s] citizens by imposing a general duly of reasonable care on product manufacturers”); Coleman, 223 Cal.App.4th at 434 (holding that plaintiffs negligence claim was not preempted where he “argued that [de *621 fendant] violated its duty of reasonable care, which would parallel the federal duty to comply with the regulations”).
The plaintiff has therefore stated claims that parallel the federal requirements under the CGMPs. See, e.g., Rosen, 41 F.Sup.3d at 186 (holding that plaintiff survived motion to dismiss where she alleged “specific manufacturing defects” and demonstrated causal connection “between those defects, the violations of applicable federal regulations, and her injuries” and where her “claims [were] neither conclusoiy nor formulaic”).
HI. Motion to Dismiss under Mass.R.Civ.P. 12(b)(6)
The defendant also moves to dismiss the plaintiffs claims under Rule 12(b)(6). A party moving to dismiss pursuant to Mass.R.Civ.P. 12(b)(6) contends that the complaint fails “to state a claim upon which relief can be granted ...” “While a complaint attacked by a . . . motion to dismiss does not need detailed factual allegations ... a plaintiffs obligation to provide the ‘grounds’ of his ‘entitle[ment] to relief requires more than labels and conclusions . . .” Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008) (ellipses and alteration in original), quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). “Factual allegations must be enough to raise a right to relief above the speculative level. . . [based] on the assumption that all the allegations in the complaint are true (even if doubtful in fact).” Id. (alteration in original), quoting Bell Atl. Corp., 550 U.S. at 555.
At the pleading stage, then, the plaintiff must assert “factual allegations plausibly suggesting (not merely consistent with) an entitlement to relief, in order to reflect the threshold requirement. . . that the plain statement possess enough heft to show that the pleader is entitled to relief.” Id. at 636 (internal quotations and alterations omitted), quoting Bell Atl. Corp., 550 U.S. at 557. Plausibility does not “impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will raise evidence of the” misconduct alleged. Twombly, 550 U.S. at 556. Therefore, “[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.” Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).
As detailed above, the plaintiffs factual allegations plausibly suggest that the damage to the wires or wire insulation in the CRT-D’s transformer resulted from a defect during the manufacturing process which the defendant failed to discover in violation of its duly of reasonable care and in violation of the above-cited CGMPs. Compare Wolicki-Gables v. Arrow Int'l, Inc., 634 F.3d 1296, 1301-02 (11th Cir. 2011) (holding that plaintiffs “failed to allege facts in their complaint alleging the presence of the elements of a parallel claim” where they did not specify particular federal requirements defendant allegedly violated but “simply incant[ed] the magic words” that defendant violated FDA regulations (citation omitted)). The 2011 letter, which the plaintiff incorporated into her complaint, also plausibly suggests that the manufacturing defect caused the decedent’s death and the plaintiffs emotional distress. In the 2011 letter, the defendant explained that the transformer “is an integral part of the” CRT-D because it transfers energy to the defibrillation capacitors. The defect in the wires or wire insulation within the transformer “prevent[ed] the device from providing life-sustaining therapy.” When the CRT-D failed, the decedent collapsed in the plaintiffs presence, striking his head and developing intracerebral hemorrhages. These facts plausibly suggest a causal connection between the defective transformer and the harm to the plaintiff and decedent. See Rodriguez, 443 Mass. at 700-01; Colter, 403 Mass. at 60-62; Restatement (Third) of Torts: Products Liability §15.
The plaintiff has accordingly stated a claim upon which relief can be granted.
ORDER
For the foregoing reasons, the defendant’s motion to dismiss is DENIED.

 The authors of the 2011 letter were the defendant’s Senior Vice President and Chief Medical Officer, Dr. Kenneth Stein, and the defendant’s Vice President of Quality Assurance, Steven C. de Baca.

 The plaintiff attached the 2011 letter to its complaint and incorporated its contents by reference. See Schaer v. Brandeis Univ., 432 Mass. 474, 477 (2000) (holding that, in evaluating Rule 12(b)(6) motion, court may take into consideration “exhibits attached to the complaint”).

 The wrongful death statute, G.L.c. 229, §2, “permits an award of punitive damages where the decedent’s death was caused by the ‘malicious, willful, wanton or reckless conduct of the defendant or by the gross negligence of the defendant.’ ” Aleo v. SLB Toys USA, Inc., 466 Mass. 398, 412 (2013).

 In a wrongful death action brought under G.L.c. 229, §2, “damages may be recovered for conscious suffering resulting from the same injury . . .” G.L.c. 229, §6.

 Section 2 of G.L.c. 229, permits claims against a person who “by his negligence causes the death of a person, or . . . is responsible for a breach of warranty arising under Article 2 of [G.L.c. 106] which results in injury to a person that causes death ...”

 This court’s decision in Morris v. Rotolo, MICV201204046, slip op. (Mass.Super.Ct. Jan. 15, 2014) (Budd, J.), does not serve as persuasive authoriiy because, unlike in this case, the plaintiff there did not specify the federal statutes and regulations that the defendant had allegedly violated. See id. at 4.

 To the extent that the defendant argues that the plaintiffs claims are impliedly preempted, that argument fails for this reason. See Buckman Co. v. Plaintiffs’ Ilegal Comm., 531 U.S. 341, 352-53 (2001) (finding that federal law impliedly preempted plaintiffs’ state law fraud claims because plaintiffs’ “fraud claims exist[ed] solely by virtue of the FDCA . . . requirements”); Coleman 223 Cal.App.4th at 426 (‘To survive implied preemption, the conduct on which the plaintiffs’ claim is based ‘must be the type of conduct that would traditionally give rise to liability under state law— . . . even if the FDCA had never been enacted’ ” (citation omitted)).